IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAR 0 5 2025

BY
DEPUTY_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22CR162 |
| | § | Judge Mazzant |
| EDWARD WALSH VAUGHAN (1) | § | |
| HADI AKKAD (2) | § | |
| JILL HALL MANDICHAK (3) | § | |
| SEAN LYNCH (4) | § | |
| KATHERINE NGUYEN (5) | § | |
| GINA ELLINGSEN (6) | § | |

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this First Superseding Indictment:

1.     Electronic Transactions Systems Corporation ("ETS") was a credit and debit card processing company incorporated and headquartered in the Commonwealth of Virginia.  Between 2012 and 2019, ETS had over 25 employees and provided card processing services for at least 7,000 different entities, including government municipalities, charity organizations, and private businesses.

2.     The city of Sherman was a municipality in the Eastern District of Texas.

3.     The defendants all had different leadership roles at ETS.  The executives responsible for the day-to-day operations of the company were **Edward Vaughan,** the President, and **Hadi Akkad**, the Executive Vice President.  The sales and customer service

leadership included: **Jill Hall Mandichak**, the National Sales Manager; **Sean Lynch**, the Sales Manager; **Katherine Nguyen**, Director of National Accounts; and **Gina Ellingsen**, the Payment Industry Expert.

### *Background on Card Processors*

4.      Credit and debit card processing companies like ETS provided equipment and services to facilitate card payment transactions.  The companies acted as middlemen, communicating card transaction information between (1) the bank that issued a customer's debit or credit card and (2) the business or entity accepting the card for payment. Specifically, such companies gave merchant clients equipment and software to allow for the acceptance of credit and debit cards, captured card transactional data, and routed it to the card network and appropriate banks.

5.      Typically, credit card processing companies entered into contracts with the business or entity (also called "merchant clients") who wished to accept card payments. These contracts and agreements discussed, among other things, the fees the merchant clients agreed to pay the card processor.

6.      Card processing fees typically fell into several categories.  One category was "Interchange" fees, which were calculated using standard, non-negotiable rates set by the card brand associations, such as Visa, Mastercard, and American Express.  Because the Interchange rates were established by the card brand associations, Interchange fees assessed to a merchant client for a given transaction were the same regardless of the

processor utilized.  Another category was processor-specific markup fees, which were negotiated and varied among the merchant clients and card processors.

7.    One pricing model adopted by many card processors, including ETS, was the "Interchange-Plus" model, also referred to as "Interchange pass through pricing" or "cost-plus pricing."  Here, the card processor charged the merchant client the fixed Interchange fee plus a negotiated markup fee for providing the card processing service.  Under this pricing model, the Interchange fee was a "pass-through" cost to the merchant client. Regardless of the pricing model, card processors typically provided merchant clients billing statements outlining the card transaction volume, number and type of card transactions, and the fees the merchant clients were charged for a given time period.

**COUNT 1**

Violation: 18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

8.    The General Allegations section of this First Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

9.    From in or around April 2012 and continuing up through the spring of 2019, in the Eastern District of Texas and elsewhere, the defendants, **Edward Vaughan**, **Hadi Akkad**, **Jill Hall Mandichak**, **Sean Lynch**, **Katherine Nguyen**, **Gina Ellingsen**, and others known and unknown to the Grand Jury, conspired to commit wire fraud, which also affected a financial institution, a violation of Title 18 United States Code Section 1343,

and knowingly and willfully joined in the agreement with the intent to further its unlawful purpose.

## Overview of the Conspiracy

10.    From April 2012 and through the spring of 2019, the defendants, at the direction of ETS president **Edward Vaughan** and Executive Vice President **Hadi Akkad**, defrauded ETS' merchant clients by deliberately disguising a portion of their processing fees for thousands of clients.  The defendants falsely represented to ETS merchant clients that ETS utilized a transparent pricing structure called "Interchange-Plus" pricing, wherein the merchant clients would be charged the Interchange fees plus an ETS-specific markup fee.  In reality, knowing that the Interchange fees would not be questioned or challenged, the defendants embedded an additional markup within the Interchange fees.  Such markup was not disclosed to the merchant clients beforehand and was concealed on the merchants' account and billing statements.

11.    The fraudulent overcharging affected approximately 7,000 merchant clients and spanned nearly 87 million card transactions.  In addition, the fraud was concealed prior to ETS' acquisition in 2018, allowing the company to be valued and sold at approximately $170 million.  Through the sale of the company, **Vaughan** received approximately $107 million, and **Akkad** received approximately $33 million.  Over the course of the scheme, and through 2023, **Vaughan** and **Akkad** used the unfairly, unjustly, and unlawfully obtained funds to personally enrich themselves through bonuses, jewelry, luxury vehicles, private aircraft, and high-end real estate purchases.

## **Purpose of the Conspiracy**

12.     It was the general purpose of the conspiracy for the defendants to unfairly, unjustly, and unlawfully enrich themselves and ETS by overcharging merchant clients by means of materially false and fraudulent pretenses, representations, and promises.

## **Manner and Means of the Conspiracy**

13.     The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

a.  The defendants caused ETS to enter into agreements with merchant clients.

b.  The defendants misled merchant clients, using contracts, sales pitches, calls, and emails, into believing that ETS utilized a transparent pricing structure with no "hidden" fees.

c.  The defendants embedded hidden markups into the Interchange fees and other program fees paid by merchant clients, concealing the markups in the contracts and the account statements provided to the merchant clients.

d.  The defendants altered the Interchange and program fees to include hidden markups by accessing billing tables and software located on computer systems belonging to a third-party company. ETS employees referred to this as accessing the "backend computer system."

e.  The defendants communicated with each other via phone, email, and in-person meetings, and used various monetary and non-monetary incentives to ensure participation in the scheme.

f.  The defendants, when explaining ETS rates to merchant clients, did not disclose the true nature of their pricing model and used the rate disclosures in the merchant client agreements to confuse, conceal, and coverup their actual billing practices.

g.  The defendants, when notified by merchant clients, third party affiliates, legal filings, and media publications about the hidden charges, denied wrongdoing and purported to offer "refunds."

h. The defendants participated in overt acts in the Eastern District of Texas, which enabled them to engage in financial transactions in excess of $10,000 with criminally-derived property.

i. The defendants engaged in financial transactions with the fraudulently obtained proceeds, including to reward themselves with large bonuses, jewelry, luxury vehicles, private aircraft, and high-end real estate, as well as to conceal the nature, location, source, ownership, and control of the proceeds.

j. The defendants, in communicating and transacting with merchant clients, caused wire transmissions that affected interstate commerce.

### **Acts in Furtherance of the Conspiracy**

In furtherance of the conspiracy, the defendants committed the following acts, among others, in the Eastern District of Texas and elsewhere.

### *Merchant Client – Sherman, Texas*

14.     On or about June 29, 2007, **Lynch** and **Akkad** executed an agreement with the city of Sherman to provide card processing services.  The parties agreed to an Interchange-Plus pricing structure, under which ETS would charge the city of Sherman (1) the Interchange fees and (2) separate ETS-specific fees based on the volume of money and the number of transactions handled.  ETS also agreed to provide periodic account statements to the city of Sherman breaking down the transactions and fees for the relevant billing period.  The city of Sherman agreed to pay the fees and charges set forth in the agreement via Automated Clearing House ("ACH") debits of its bank account, which would cause interstate wire transmissions.

15.     Although ETS represented that the Interchange fees were simply a pass-through cost of what the card brands charged, ETS actually embedded markups within the

Interchange fees. Specifically, ETS included an additional 0.30% markup on Visa and MasterCard debit and prepaid card Interchange fees. This markup was never discussed in the contract, never disclosed by an ETS employee to the city of Sherman, and never shown or displayed on the account statements sent to the city of Sherman.

16.     For example, in or around January 2018, ETS sent the city of Sherman an account statement showing what the city of Sherman owed ETS for the month of December 2017. On this account statement, ETS included a separate section called "Interchange Fees / American Express Program Fees" which totaled $3,075.31. However, based on the publicly available Interchange rate schedule, the total should have been $2,682.63, approximately $392 less than the billed amount. Similar discrepancies and markups were found on various other account statements.

17.     Between January and April 2018, an employee with Sherman, from a location in the Eastern District of Texas, placed multiple phone calls to ETS to discuss the billing concerns. In one call on January 22, 2018, the Sherman employee asked if the Interchange fees in the Interchange section of the merchant statement strictly went to Visa, MasterCard, and Discover. ETS employee E.F. answered, "Exactly," and falsely confirmed that ETS did not retain any of the Interchange fees and instead passed those payments on to the card brands.

18.     On April 9, 2018, an employee with Sherman left a telephone message for **Akkad** regarding a requested audit but never received a return telephone call. On May 3,

2018, the employee followed up with an email to E.F. that was subsequently forwarded to

**Akkad**. The email read in part:

> The audit request was prompted when a competitor provided an analysis of our monthly statements. The analysis showed a surcharge on the interchange category. From all of my discussions with ETS representatives, the interchange rate is a "passthrough" charge only. ETS does not add to the interchange rate/charge. Attached is a copy of an analysis reflecting a markup %...

The Sherman employee received email read-receipts from E.F. and from **Akkad** on May

3, 2018, but never received an email or telephone response. During the course of the

fraudulent scheme, the city of Sherman was overcharged on at least 130,820 transactions

and overpaid, via interstate wire transmissions, approximately $34,166 to ETS.

### *Examples of the Defendants' Execution of the Fraud*

19.     The defendants took steps to actively embed and conceal the hidden markups

in the Interchange fees. For instance:

    a. At the beginning of the scheme, **Vaughan** held a "merchant statement design meeting" where **Vaughan** chose to format the merchant statements to hide the 0.30% markup fee.

    b. On May 30, 2014, **Vaughan** logged in to the backend computer system and made changes to the debit card interchange rates in the "Billing Element Tables." On June 25 and 27, 2014, **Vaughan** again logged into the backend system to correct errors made to the rates. On January 30, 2018, **Vaughan** logged in to correct an error made to the American Express Interchange rates.

    c. On several occasions between April 2016 and December 2017, **Akkad**, at the direction of **Vaughan**, accompanied and instructed ETS employee J.D. to verify and ensure the hidden markup was applied to all the debit card Interchange rates on the backend computer system.

20.    In order to attract new business, the defendants performed detailed cost comparisons for prospective merchant clients, in which ETS compared the client's existing bill with what ETS would offer.  In these cost comparisons, the defendants pitched the Interchange-Plus pricing model without any mention of the hidden markups to the Interchange fees.  For example:

    a. On or about February 1, 2016, **Hall Mandichak** sent a cost comparison to an employee at company L.F., a prospective merchant client.  In the cost comparison table, **Hall Mandichak** included two rows for "Interchange Clearing Fee" and "Interchange Fees."  The "ETS %" cells were "0" and left blank, respectively, indicating there was no ETS revenue generated from the Interchange fees.  In April 2016, the email chain was forwarded to **Akkad** and **Lynch**.  Based on the representations made, company L.F. entered into a contract with ETS for card processing services.

    b. On or about October 2, 2013, **Hall Mandichak** sent a cost comparison to an employee at company L.V.  In the cost comparison table, **Hall Mandichak** left blank the cells for "ETS Markup" as it pertained to Interchange fees.  In the email, **Hall Mandichak** also stated that "ETS does not charge miscellaneous fees" and stated that ETS solutions "are comprehensive, innovative, and transparent."  Based on the representations made, company L.V. entered into a contract with ETS for card processing services.

    c. On or about February 4, 2014, **Hall Mandichak** pitched an employee at company J.J. about the cost savings of switching to ETS.  **Hall Mandichak** stated that "ETS would offer you Cost Plus [Interchange-Plus] .20% (20 basis points) over cost on credit cards with a $.10 markup per item."  **Hall Mandichak** never disclosed the markup in the Interchange fees.

21.    The defendants were confronted by merchant clients regarding the hidden markup within the Interchange fees.  In response to these inquiries, the defendants reiterated the transparency of ETS' "Interchange-Plus" model and gave varying explanations about the markup on the Interchange fees.  For example:

a. On January 3, 2019, an employee from government entity P.W.V., an ETS merchant client, called **Ellingsen** regarding the 0.30% markup. **Ellingsen** gave various inconsistent explanations for the markup. For example, early in the conversation, **Ellingsen** acknowledged the confusion in the merchant client contract, apologizing because it "wasn't really made clear at the time of the initial signing of the contract." Later in the conversation, **Ellingsen** claimed that the pricing schedules were indeed transparent. **Ellingsen** argued that "this table is laid out for the scheduling of the pricing on your account, we feel is a clear indication of how it should, how you should be priced." When pressed further, **Ellingsen** stated computer and technical limitations prevented ETS from overtly displaying the 0.30% hidden markup on the merchant account statement. In reality, there was no such limitation.

b. On June 14, 2018, an undercover law enforcement officer ("UCE") acting as a contractor for government entity N.P., an ETS merchant client, met with **Nguyen** at the ETS office in Virginia. When asked about the 0.30% ETS fee markup, **Nguyen** acknowledged the fraud: "[A]nd and you are 100% correct in saying that the .30 essentially should be up here [Plan Summary section of the merchant statement ending in 3831] for reflecting what is paid to ETS." On or about August 28, 2018, the UCE asked **Nguyen** over the phone whether government entity N.P. was the first ETS client to bring the 0.30% markup to ETS' attention. **Nguyen** responded, "That is correct," despite being alerted to the hidden markup via email nearly two years prior. In that email, sent on or about October 4, 2016, an employee from merchant client I.E. emailed **Nguyen**, "… I see that this account in particular is already competitively priced, however there is a surcharge of 0.30% being applied to all debit transactions above interchange cost…"

22.     The defendants internally discussed the fraud, the markup, and how to conceal the fraud from merchant clients. For instance:

a. On or about June 28, 2016, in an email message that was sent to **Akkad** and then forwarded to **Vaughan**, a customer complained: "[Merchant client] is currently being charged a .30% markup on top of all debit volume. The most discourteous measure is that the markup is hidden within the interchange transactions, not labeled with a rate, and sometimes not labeled with the correct description…"

b. On or about October 21, 2016, in an email thread discussing cost comparisons with a competitor, **Lynch** emailed **Akkad**: "I think we are charging an additional .20% for all DB tiers. Looks like we are charging .20% under the

Plan Summary section and then adding the .30% to all DB tiers under the Interchange Fees section."

c.  On or about October 11, 2018, in an email thread titled "Confidential: Debit Markup," **Ellingsen** and **Vaughan** discussed a merchant client's concern regarding markup. **Ellingsen** stated: "The issue they have is that on the pricing scheduled we only mention the 30 bps markup for Debit, we do not separate out the Discount for that.  So we are actually collecting Discount and the markup of Interchange for every signature debit transaction." **Vaughan** confirmed the effective rate and stated "Okay.  Got it."

### *Vaughan and Akkad's Concealment of the Scheme and Sale of the Company*

23.     In order to conceal their criminal scheme, **Vaughan** and **Akkad** created a workplace environment at ETS with monetary and non-monetary incentives to reward loyalty and discourage exposure of the ETS' true business operations.  As such, **Vaughan** and **Akkad** paid employees, including their co-defendants, substantial bonuses and bought them vehicles.  For instance, **Vaughan** gifted **Nguyen** a 2017 Mercedes Benz GLS 450. From July 2013 to January 2016, **Vaughan** and **Akkad** authorized multiple payments to **Hall Mandichak**, in addition to her regular salary payments, totaling approximately $200,000.  Similarly, from January 2013 to December 2015, **Vaughan** and **Akkad** authorized multiple payments to **Lynch**, on top of his regular salary, totaling over $87,000. In addition, in the spring of 2018, **Vaughan** offered **Ellingsen** a 65% salary increase to leave her job at a third-party affiliate and come work for ETS.

24.     The defendants' concealment of the hidden markups also inflated the valuation of ETS, enabling **Vaughan** and **Akkad** to profit from the sale of ETS in 2018. ETS was valued at and purchased by a payment processing company for approximately $170 million.  As part of the acquisition, **Vaughan** received an approximate $107 million

buyout for his ownership interest in ETS, while **Akkad** received approximately $33 million. **Vaughan**, **Akkad**, and **Ellingsen** stayed with ETS after the ETS acquisition and continued to coverup the fraudulent overcharging. However, once the hidden fees were revealed, the acquiring entity corrected the billing practice, offered refunds, and contacted all affected merchant clients. During the course of the scheme, ETS fraudulently overcharged on approximately 87 million card transactions, affecting approximately 7,000 merchant client accounts.

All in violation of 18 U.S.C. § 1349.

## COUNT 2

Violation:  18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)

25.     Paragraphs 1 through 24 of this First Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

26.     Between in or around April 2012 and continuing through the summer of 2023, in the Eastern District of Texas and elsewhere, the defendants, **Edward Vaughan** and **Hadi Akkad**, did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to:

a.  knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

b.  knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, that is, wire fraud in violation of 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1957.

27.     **Vaughan** and **Akkad** personally benefitted from the fraudulent overcharging of merchant clients.  Using funds sourced from the fraudulent overcharging and fraudulent sale of the company, they engaged in numerous financial transactions in excess of $10,000, including purchases of luxury cars, jewelry, personal aircraft, and high-end real estate

properties. For instance, **Vaughan** purchased or made payments on the following, among other things: three Ferrari sports cars; four Mercedes-Benz vehicles; two Audi vehicles; three personal aircraft; over $2 million worth of Tiffany's jewelry; two properties in Pebble Beach, California; one property in Malibu, California; and four properties in Virginia. **Akkad**, meanwhile, purchased or made payments on a condominium in Washington, D.C., a Mercedes-Benz vehicle, a Jeep, and a multiacre brewery and distillery. In addition, between 2013 and 2018, **Vaughan** took $13.3 million in "bonus" payments from ETS, on top of his regular salary payments. **Akkad** took $4.9 million in "bonus" payments over the same time period.

28.     **Vaughan** and **Akkad** also engaged in financial transactions that were designed to conceal and disguise the true nature, location, source, ownership, and control of their fraudulently obtained proceeds. For example, in January 2023, approximately one month after co-defendants **Hall Mandichak**, **Lynch**, and **Nguyen** pleaded guilty to wire fraud in this matter, **Akkad** transferred over $12 million dollars of the money he obtained from the fraudulent sale of the company to a brokerage account held solely in the name of his wife, K.A.

All in violation of 18 U.S.C. § 1956(h).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461

1.     The allegations contained in Counts 1 and 2 of this First Superseding Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

**2.**     Upon conviction of any violation of 18 U.S.C. § 1349, the defendants, **Edward Vaughan**, **Hadi Akkad**, **Jill Hall Mandichak**, **Sean Lynch**, **Katherine Nguyen**, and **Gina Ellingsen**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and pursuant to 18 U.S.C. § 982, any proceeds or property, real or personal, involved in a violation of 18 U.S.C. § 1956(h), including but not limited to the following:

**Real Property:**

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 12000 Market Street Unit #308, Reston, Virginia 20190 being the same property more fully described as follows: Condominium Unit No. 308, Phase 1, SAVOY AT RESTON TOWN CENTER CONDOMINIUM, and the limited common elements appurtenant thereto, as duly created in the Declaration of Condominium and Exhibits attached thereto, recorded March 1, 2005 in Deed Book 17017 at Page 1428, among the land records of Fairfax County, Virginia. TOGETHER WITH limited common element Garage Parking Space No. GU-287, as designated on the Exhibits attached to the aforesaid Declaration of Condominium. Tax Map Number: 017-1-30-0308.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 42710 Little Sorrel Lane Leesburg Virginia

20176 being the same property more fully described as follows: Lot 7, Phase 2, LEES CROSSING, as the same is duly dedicated, platted and recorded in Deed Book 1745 at Page 151, among the land records of Loudoun County, Virginia.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 14980 Limestone School Road, Leesburg, Virginia 20176 being the same property more fully described as follows: BEGINNING at a point at the intersection of Limestone School Road (VA. State Route 661, 30' Prescriptive Right-of-Way) and Spinks Ferry Road (VA. State Route 657, 30' Right-of-Way), said point being in the center of said roads and being the point of beginning, and the beginning of a curve; thence departing Limestone School Road and continuing with Spinks Ferry Road the following four (4) courses and distances: 146.35' along the arc of a curve deflecting to the left, having a radius of 435.35', a central angle of 19° 16' 35", and a chord bearing and distance of N 78° 35' 54" E 145.66' to a point of tangency; thence N 68° 57' 34" E 683.02' to a point; thence N 69° 08' 29" E 340.92' to a point; thence N 72° 12' 01" E 720.65' to a point being a corner to Robert H. and Patricia A. Meurer (Deed Book 1632, Page 1221); thence departing Spinks Ferry Road and continuing with Meurer and then Richard McAfee (Deed Book 1406, Page 803) S 5° 50' 21" E 2834.87' to a point being in the line of McAfee and corner to another parcel owned by Harold L. and Charlotte E. Shotwell, (passing over an iron pipe found at 25.55'); thence departing McAfee and continuing with Shotwell the following two (2) courses and distances S 89° 10' 06" W 992.79' to an iron pipe found; thence S 2° 50' 33" E 1366.34' to an iron pipe found being a corner to Nancy H. O'Conner (Deed Book 1133, Page 393); thence departing Shotwell and continuing with O'Conner S 87° 00' 00" W 1214.49' to a point in the center of aforementioned Limestone School Road; thence departing O'Conner and continuing with Limestone School Road N 1° 00' 39" E 3647.66' to the point of beginning containing 6,588,692 square feet or 151.25555 acres of land, more or less, and being all of Loudoun County Tax Map 30 Parcel 28. And further described as follows: All that certain lot or parcel of land containing 151.25555 acres of land more or less, as more particularly described by metes and bounds description and plat attached to Deed recorded in Deed Book 1956 at Page 2099 among the land records of Loudoun County, Virginia. TOGETHER WITH AND SUBJECT TO that certain Easement Agreement recorded in Instrument Number 20120612-0044444 and Plat recorded in Instrument Number 20120612-0044445 among the aforesaid land records.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 1143 Porque Lane, Pebble Beach, California 93953 being the same property more fully described as follows: All of Parcel B, as said Parcel is shown on that Parcel Map which said Map was filed for Record in the

Office of the Recorder of the County of Monterey, State of California, on June 7, 1974, in Volume 6, of Parcel Maps, at Page 110.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 28820 Grayfox Street, Malibu, California 90265 being the same property more fully described as follows: Parcel 1: A parcel of land, being a portion of the Rancho Topanga Malibu Sequit, in the City of Malibu, County of Los Angeles, State of California, as confirmed to Matthew Keller by patent recorded in Book 1, Page 407 et seq., of patents, in the office of the County Recorder of said County, particularly described as follows: Beginning at a point in the centerline of private road easement no. 3 (Grayfox Street), described in the declaration of easements recorded April 11, 1946 in Book 23095, Page 1 official records, said point of beginning being south 37° 39' 03" east 425.00 feet from the northwesterly extremity of that certain centerline course described in said easement no. 3, as south 37° 39' 03" east 657.43 feet; thence from said point of beginning south 37° 39' 03" east 140.00 feet along said centerline; thence south 52° 20' 57" west 355.00 feet; thence north 51° 14' 49" west 122.75 feet; thence north 55° 08' 47" west 21.69 feet; thence north 52° 20' 57" east 390.38 feet to the point of beginning. the above described land is known as parcel 93 on a record of survey filed in book 57, pages 9 and 10 of records of surveys, in the office of the county recorder of said county. except therefrom all minerals, oil, petroleum, asphaltum, gas, coal and other hydrocarbon substances in, on, within and under said lands and every part thereof, but without surface right of entry as reserved by Marblehead Land Company in deed recorded May 31, 1946 in book 23168, page 266, official records. Parcel 2: Easements for ingress and egress over those lands described as easements nos. 1 to 7 inclusive, in that certain instrument designated "Declaration of Easement by Marblehead Land Company" recorded in book 23095, page 1, official records. Apn: 4466-011-005.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 1278 Padre Lane, Pebble Beach, California 93953 being the same property more fully described as follows: Condominium Lot 3, as shown on that certain Map entitled, "Tract No. 100, Rock Hill Subdivision", in the County of Monterey, State of California, filed April 25, 1944 in Volume 4, Maps of "Cities and Towns", at Page 70, in the Office of the County Recorder of said County.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 15066 Limestone School Road, Leesburg, Virginia 20176 being the same property more fully described as follows: BEGINNING at stone found, said point being a corner to Verne T. and Kathleen A. Dickerson (Deed Book 1542, Page 554) and Nancy H. OConner (Deed Book 1133,

Page 393); thence departing Dickerson and continuing with OConner S 87° 22' 33" W 1062.10' to an iron pipe found being a corner to another parcel owned by Harold L. & Charlotte E. Shotwell; thence departing OConner and continuing with Shotwell the following two (2) courses and distances N 2° 50' 33"W 1336.34' to an iron pipe found; thence N89° 10' 06"E 992.79' to a point in the line of Richard McAfee (Deed Book 1406, Page 803); thence departing Shotwell and continuing with McAfee and then aforementioned Dickerson S 5° 50' 21" E 1337.38' to the point of beginning (passing over an iron pipe found at 392.3', being the corner to McAfee and Dickerson) containing 1,386,924 square feet or 31.83940 acres of land more or less and being all of Loudoun County Tax Map 30 Parcel 27.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 40983 Alysheba Drive, Leesburg, Virginia 20176 being the same property more fully described as follows: Lot 5EQ, Phase 3, Section 3, BEACON HILL, as the same appears duly dedicated, platted, and recorded in Deed Book 2089 at Page 325 among the land records of Loudoun County, Virginia.

All that lot or parcel of land, together with buildings, improvements, fixtures, attachments, and easements located at 1212 Eton Court Northwest, Unit T13, Washington District of Columbia 20007 being the same property more fully described as follows: Tax ID: 1206 2023: For assessment and taxation purposes, known as Lot 2023 in Square 1206.Being the same property described in instrument Number 42113 recorded among the aforesaid land records. Condominium Unit T-13- (hereinafter called the Condominium Unit'), in Eton, a Condominium (hereinafter called "the Condominium"). The Condominium was constituted and established under the Condominium Act of 1976 of the District of Columbia by Condominium Declaration recorded April 8, 1981 as Instrument No. 11439 among the Land Records of the District of Columbia and any recorded amendments thereto as of the date hereof and as per plat recorded in the Office of the Surveyor for the District of Columbia in Condominium Book 28, Page 18, Together with an undivided percentage share in the common elements of said Eton, a Condominium, as set forth in said declaration of condominium and exhibits thereto. Said Condominium project is situated in Lot 41 Square 1206 in the subdivision made by M & Potomac Street Associates Limited Partnership as per plat recorded in Liber 171 at Folio 149, in the Office of the Surveyor for the District of Columbia.

Lot 14, SIMPSON ESTATES SUBDIVISION, as duly dedicated, platted and recorded at Instrument Number 20130709-0057283 among the land records of Loudoun County, Virginia. (Parcel Number: 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-000)[1]

Lot 15, SIMPSON ESTATES SUBDIVISION, as duly dedicated, platted and recorded at Instrument Number 20130709-0057283, among the land records of Loudoun County, Virginia. (Parcel Number: 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-000)

Lot 16, SIMPSON ESTATES SUBDIVISION, as duly dedicated, platted and recorded at Instrument Number 20130709-0057283, among the land records of Loudoun County, Virginia, more commonly known as 40950 Simpson Farm Lane, Lovettsville, Virginia 20180. ((Parcel Number: 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-000)[2]

**Vehicles:**

2014 Ferrari 4SP VIN: ZFF68NHAXE0202916

2016 Mercedes-Benz GL 550 VIN: 4JGDF7DE0GA652289

2017 Mercedes-Benz SL63 AMG VIN: WDDJK7EA5HF047371

2017 Lincoln MKZ VIN: 3LN6L5A97HR601084

2017 Mercedes-Benz GLS 450 VIN: 4JGDF6EE4HA943582

2014 Ferrari Spider 458 VIN: ZFF68NHA7E0203554

2019 Ferrari Portofino VIN: ZFF89FPA9K0238802

2018 GMC Yukon VIN: 1GKS2HKJ0JR398822

2019 Jeep Wrangler Unlimited VIN: 1C4HJXFGXKW654968

2020 Audi R8 VIN: WUAKBAFX8L7900043

2018 Mercedes-Benz GLS 550 VIN: 4JGDF7DE3JB093466

2019 Mercedes-Benz AMG GT VIN: WDD7X8KB3KA006434

2021 Jeep Wrangler Unlimited VIN: 1C4HJXFN8MW524267

2021 Mercedes-Benz G63 AMG VIN: W1NYC7HJ6MX389734

2021 Jeep Wrangler Unlimited VIN: 1C4HJXFN1MW565761

2021 Audi e-tron VIN: WA12AAGE4MB039370

---

[1] Lots 14 and 16 may collectively be identified under a different name:  40950 Flying Ace Lane, Lovettsville, Virginia 20180.

2013 Mercedes-Benz SL63 2DR Roadster VIN: WDDJK7EA1DF007007

**Personal Property:**

2003 PIAGGIO P180 (N962JC/SERIAL NUMBER: 1062) and any aircraft log books, maintenance records, data cards, airworthiness certificates, registration documents, aircraft keys, and associated aircraft equipment/accessories.

1986 Falcon 50 (N80BC/SERIAL NUMBER: 166) and any aircraft log books, maintenance records, data cards, airworthiness certificates, registration documents, aircraft keys, and associated aircraft equipment/accessories.

2013 Cessna 182T (N94825/SERIAL NUMBER: 18282324) and any aircraft log books, maintenance records, data cards, airworthiness certificates, registration documents, aircraft keys, and associated aircraft equipment/accessories.

**Jewelry:**

Diamond Hoop Earrings in Platinum with a Total Carat Weight of 10.71, Tiffany SKU #62501774

Patek Phillipe White Gold Diamond Pave Nautilus Watch, Tiffany SKU #34180652

Platinum Diamond Necklace, Tiffany SKU #63466271

Platinum Diamond Ring, Tiffany SKU #63183342

White Gold Diamond Necklace, Tiffany SKU #33476744

Diamond Bracelet, Tiffany SKU #60929513

Platinum Diamond Earrings, Tiffany SKU #63841471

Sterling Silver Bracelet, Tiffany SKU #33282273

Sterling Silver/Leather Bracelet, Tiffany SKU #33648219

Stainless Steel Bracelet, Tiffany SKU #36618159

Sterling Silver Golf Tee, Tiffany SKU #13722056

Sterling Silver and Titanium Ring, Tiffany SKU #27904408

Sterling Silver Letter Opener, Tiffany SKU #63311766

Sterling Silver Army Knife, Tiffany SKU #63311782

Platinum Chain 20", Tiffany SKU #24292002

White Gold Chain 16", Tiffany SKU #33430523

Platinum Diamond Key Pendant, Tiffany SKU #35522034

Platinum Diamond Key Pendant, Tiffany SKU #35547452

Platinum Diamond Earrings, Tiffany SKU #35390529

Platinum Wedding Band, Tiffany SKU #21623717

Sterling Silver Cuff, Tiffany SKU #68772303

**Financial Assets:**

Any and all funds, monies, and assets in account number T6Y045012 held at Pershing LLC, which is part of BNY Mellon Corporation, including but not limited to, all investment assets in the account that were acquired, obtained, or purchased using criminally derived funds, which, as of January 2, 2025, had a value of $12,939,527.72.

4.    Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendants:

a.  Cannot be located upon the exercise of due diligence;

b.  Has been transferred, or sold to, or deposited with a third party;

c.  Has been placed beyond the jurisdiction of the Court;

d.  Has been substantially diminished in value; or

e.  Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants

up to the value of the above-described forfeitable properties, including, but not limited to,

any identifiable property in the names of the defendants, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

5.    By virtue of the commission of the offenses alleged in this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

ABE McGLOTHIN
ACTING UNITED STATES ATTORNEY

_____
ANAND VARADARAJAN
HEATHER RATTAN
G.R. JACKSON
Assistant United States Attorneys

_____
3 / 5 / 2025
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22CR162 |
| | § | Judge Mazzant |
| EDWARD WALSH VAUGHAN (1) | § | |
| HADI AKKAD (2) | § | |
| JILL HALL-MANDICHAK (3) | § | |
| SEAN LYNCH (4) | § | |
| KATHERINE NGUYEN (5) | § | |
| GINA ELLINGSEN (6) | § | |

## NOTICE OF PENALTY

## COUNT 1

Violation:      18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

Penalty:        Imprisonment for a term not more than 20 years, a fine not to exceed $250,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment.

If the violation affected a financial institution, then:
Imprisonment for a term not more than 30 years, a fine not to exceed $1,000,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than five years in addition to such term of imprisonment.

Special
Assessment:     $100.00

## **COUNT 2**

Violation:        18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)

Penalty:        Imprisonment for a term not more than twenty years, a fine not to exceed $500,000, or  twice the value of the monetary instruments or funds involved, whichever is greater; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment.

Special
Assessment:        $100.00 each count